[Nos. 53656-7-I; 53750-4-I; Division One. March 7, 2005.]
53751-2-I; 53793-8-I.

*In the Matter of the Dependency of* T.L.G. ET AL.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*, v. WILLIAM GILFILLEN ET AL., *Appellants*.

182

*John Eric Gibson* and *Christopher H. Gibson* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant Bonnie Dunlavy.

*Elaine L. Winters* (of *Washington Appellate Project*), for appellant William Gilfillen.

*Robert M. McKenna, Attorney General,* and *Scott D. Wessel-Estes, Assistant,* for respondent.

*Bruce I. Weiss,* for the children's guardian ad litem.

¶1 ELLINGTON, A.C.J. — This termination of parental rights case involves two distinct issues. The first is whether the Indian Child Welfare Act of 1978 (ICWA) (the Act)[1] required the trial court to ensure that the tribe or the Bureau of Indian Affairs (BIA) be notified of the termination proceedings. The second is whether the Department of Social and Health Services (DSHS) offered the parents all necessary services, and whether the parents were capable of parenting in the near future.

¶2 Because the children were possibly Indian children, the court was required to notify the tribe or the BIA of the proceedings. This requirement was not satisfied. Further, DSHS failed to provide all necessary services and failed to show that parental deficiencies could not be remedied in the near future. We reverse the termination of parental rights and remand for further proceedings.

## FACTS

¶3 Bonnie Dunlavy and Keith Gilfillen are the biological parents of T.G. (age 5) and C.G. (age 4). Prior to C.G.'s birth, there were no reports of problems with the parents' care of T.G. When C.G. was born in May 2000, he suffered from numerous disabilities. These included a cranial deformity that created difficulties with eating and necessitated feeding through a tube into his stomach. In the summer of 2000, C.G. spent two months in hospital because Dunlavy and Gilfillen were overwhelmed with the demands of caring for him.

[1] 25 U.S.C. §§ 1901-23.

¶4 In September 2000, DSHS instituted the first of a series of voluntary contracts with Dunlavy and Gilfillen.[2] The contract provided for public health nurse visits, therapeutic day care for both children, and the services of an intensive family preservation services (IFPS) therapist. Of primary concern were the parents' mental health needs. Gilfillen had been diagnosed with bipolar disorder and severe anxiety; Dunlavy had experienced depression and had attempted suicide.

¶5 Sometime during this period, Dunlavy, who had been adopted as an infant, informed DSHS that she had been told her biological father was full-blooded Cherokee.

¶6 In August 2001, after approximately a year of voluntary contracts, Dunlavy and Gilfillen refused to sign a further contract for services with the public health nurse. DSHS filed dependency petitions on both children and removed them from the home. Eventually, DSHS sought termination of parental rights. After a trial, the court entered an order terminating the rights of both parents to both children.

## DISCUSSION

### Indian Child Welfare Act

■■ ¶7 Dunlavy argues that the court erred by failing to verify the children's possible status as Indian children, and consequently failed to apply the heightened standards required by the Act in termination proceedings.[3] Congress

---

[2] The intake social worker reported the primary concerns were lack of effective parenting skills, lack of effective communication skills, possibly a lack of attachment to C.G., a too-small apartment, and the challenges of parenting a child with special medical needs. *See* Ex. 115 at 6.

[3] ICWA identifies three specific requirements for finding that termination of parental rights is warranted. In pertinent part, it provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by [1] evidence beyond a reasonable doubt, including [2] testimony of qualified expert witnesses, that [3] the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

enacted ICWA in 1978 to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families."[4] The Act applies to child custody proceedings, which include actions to terminate parental rights.[5] Congress was concerned not only with the interests of the individual members of a tribe, but also with the interests of the tribe itself.[6] ICWA grants tribes significant rights, including exclusive jurisdiction where an Indian child resides within its reservation, and the right to intervene when proceedings occur in state court.[7] ICWA mandates that the tribe or the BIA be notified of pending proceedings in which:

> the court knows or has reason to know that an Indian child is involved, the party seeking . . . termination of parental rights . . . shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner.[8]

¶8 To clarify this notice obligation, the BIA has issued "Guidelines for State Courts; Indian Child Custody Pro-

---

25 U.S.C. § 1912(f).

ICWA also requires that:

> Any party seeking . . . termination of parental rights to an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and these efforts have proved unsuccessful.

25 U.S.C. § 1912(d).

[4] 25 U.S.C. § 1902.

[5] 25 U.S.C. § 1903(1).

[6] See Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 34-35, 109 S. Ct. 1597, 104 L. Ed. 2d. 29 (1989).

[7] 25 U.S.C. § 1911(a), (c).

[8] 25 U.S.C. § 1912(a). Notice is mandatory whenever the court has a reason to believe the child is Indian, regardless of how late in the proceedings the issue may arise. In re Kahlen W., 233 Cal. App. 3d 1414, 1425-26, 285 Cal. Rptr. 507 (1991).

ceedings."[9] These guidelines set forth the circumstances that trigger an inquiry by the court and petitioners regarding the child's Indian status for the purpose of ICWA:

(a) When a state court has *reason to believe* a child involved in a child custody proceeding is an Indian, the court *shall seek verification* of the child's status from either the Bureau of Indian Affairs or the child's tribe . . . .

(b)(i) *The determination by a tribe* that a child is or is not a member of that tribe, is or is not eligible for membership in that tribe, or that the biological parent is or is not a member of that tribe *is conclusive.*

. . . .

(c) Circumstances under which a state court has reason to believe a child involved in a child custody proceeding is an Indian include [when] . . . :

(i) Any party to the case . . . informs the court that the child is an Indian child.[10]

¶9 Washington has parallel notice requirements. At the time of the termination trial, former RCW 13.34.070 (2000)[11] provided in part:

(10) In any proceeding brought under this chapter where the court knows or has reason to know that the child involved is a member or is eligible to be a member of an Indian tribe, notice of the pendency of the proceeding shall also be sent by registered mail, return receipt requested, to the child's tribe. If the identity or location of the tribe cannot be determined, such

---

[9] 44 Fed. Reg. 67,584-95 (Nov. 26, 1979).

[10] Guideline B.1, 44 Fed. Reg. 67,586 (emphasis added). The BIA guidelines do not have "binding legislative effect." 44 Fed. Reg. 67,584; *see also Miss. Choctaw,* 490 U.S. at 51 n.26. But courts have generally followed the recommended procedures, and have given a broad reading to the notice requirement. *See, e.g., In re Dependency of Colnar,* 52 Wn. App. 37, 39-41, 757 P.2d 534 (1988) (following guidelines); *In re Dependency of N.A.H.,* 418 N.W.2d 310, 311 (S.D. 1988) (better practice is to follow BIA guidelines); *In the Interest of H.D.,* 11 Kan. App. 2d 531, 534, 729 P.2d 1234 (1986) (guidelines establish "pretrial requirements"); *In re Junious M.,* 144 Cal. App. 3d 786, 792 n.7, 193 Cal. Rptr. 40 (1983) (guidelines entitled to "great weight"). *But see In re Interest of Mahaney,* 146 Wn.2d 878, 892, 51 P.3d 776 (2002) (strict reading of the guidelines held at odds with the special circumstances of the case).

[11] *Amended by* Laws of 2004, ch. 64, § 4.

notice shall be transmitted to the secretary of the interior of the United States.

This notice requirement was significantly strengthened in 2004.[12] Federal and state legislative intent[13] to provide notice to tribes and the BIA is clear.

¶10 Here, Dunlavy had heard from her adoptive parents that her biological father was full-blooded Cherokee,[14] and told DSHS of this a few months into the first voluntary services contract in fall of 2000. However, Dunlavy did not challenge the assertion, in both the dependency petition and the agreed dependency order, that the children were not Indian. It was not until two and a half years later, at the permanency planning hearing in July 2003, that the issue reemerged. At that point, the court ordered DSHS to investigate whether the children were of Native American heritage.

¶11 George Nelson, the DSHS caseworker, wrote to Dunlavy twice in August 2003, informing her that she needed to send a notarized letter to the California Depart-

---

[12] RCW 13.34.070 now reads:

(10)(a) *Whenever* the court or the petitioning party in a proceeding under this chapter knows or has reason to know that an Indian child is involved, the petitioning party shall *promptly provide notice* to the child's parent or Indian custodian and to the agent designated by the child's Indian tribe to receive such notices. Notice shall be by certified mail with return receipt requested. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, notice shall be given to the secretary of the interior in the manner described in 25 C.F.R. § 23.11. If the child may be a member of more than one tribe, the petitioning party shall send notice to all tribes the petitioner has reason to know may be affiliated with the child.

(b) *The notice shall: (i) Contain a statement notifying the parent or* custodian and the tribe of the pending proceeding; and (ii) notify the tribe of the tribe's right to intervene and/or request that the case be transferred to tribal court.

(Emphasis added.)

[13] The House Bill Report stated: "Failure to verify whether the child is an Indian child, as defined under the ICWA, can jeopardize the validity of subsequent proceedings pertaining to the child." H.B. REP. ON SUBSTITUTE H.B. 5031, 58th Leg., Reg. Sess. (Wash. 2004).

[14] Dunlavy's adoptive mother testified she was told by the adoption worker at the time of Dunlavy's adoption that Dunlavy "might be Indian blood, you should check that out." Report of Proceedings (RP) (Dec. 8, 2003) at 464. Dunlavy testified she learned from her adoptive parents that her father was "full blooded Cherokee." RP (Dec. 9, 2003) at 489.

ment of Adoptions to access information regarding her biological parents, and attached a release of information form to allow DSHS to follow up with the California authorities. Dunlavy called Nelson and provided him with the information he had requested from her birth certificate. At the pretrial hearing on September 2, the court ordered Dunlavy to sign all releases[15] needed to obtain records of her adoption, and ordered her to follow up immediately with the California authorities, and to contact Nelson if she needed assistance. Nelson sent two further letters to Dunlavy, the last of which informed her that she needed to petition the superior court in Santa Clara to have her adoption records unsealed.[16] Dunlavy called Nelson and requested that he follow up with the authorities in California because her phone card had run out.

¶12 Ultimately, neither DSHS nor the court provided notice to the tribe[17] or to the BIA. The trial court concluded that ICWA did not apply because Dunlavy was not an enrolled member of any tribe and had done nothing to assist DSHS.

¶13 To invoke ICWA, the child involved in the custody proceeding must be an Indian child, which is defined in the Act as "either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the *biological child of a member* of an Indian tribe."[18] Dunlavy testified she is neither enrolled in a tribe nor a member of a tribe. The State argues that the children are therefore not Indian children, and the notice requirements of ICWA were never triggered.

---

[15] The record does not include these releases, nor reveal whether they were signed or used.

[16] Dunlavy testified at trial she had "no idea how to do that." RP (Dec. 9, 2003) at 548.

[17] There are three federally recognized Cherokee tribes: Cherokee Nation, Oklahoma; United Keetowah Band of Cherokee Indians in Oklahoma; and Eastern Band of Cherokee Indians of North Carolina. Each has separate membership requirements. 67 Fed. Reg. 46,328 (July 12, 2002).

[18] 25 U.S.C. § 1903(4) (emphasis added).

¶14 But tribal enrollment is not the only means of establishing Indian heritage.[19] Nor is Dunlavy's belief that she is not a tribal member dispositive. Tribes control the rules of their membership, and whether Dunlavy is a member is a question only the tribe can definitively answer.[20] One reason notice is a key component of ICWA is to ensure that tribes will have the opportunity to assert their rights independent of the parents or state agency. Without notice, the rights granted to tribes by the Act are meaningless.[21]

■ ¶15 Noncompliance with notice requirements in similar circumstances has repeatedly led to remand for proper notice, even where the parent offered no proof of membership and was not enrolled in a tribe. The legislative objective is to protect the interests of the tribe and the children; to this end, the onus is on the court and the State, not the parents. In *In re Dependency of Colnar,*[22] the mother alleged at the termination hearing that she was one-quarter Apache Indian. DSHS contacted the Apache nation to research the mother's bloodline, then filed an affidavit stating that the child was not qualified to be enrolled. No formal notice was sent to the tribe. Parental rights were terminated. The court held that even though DSHS contacted the tribe, its investigation did not constitute proper notice under ICWA or RCW 13.34.070.[23] In *In re Kahlen W.,*[24] the California Department of Social Services contacted both the BIA and several tribes to investigate the

---

[19] *See Mahaney,* 146 Wn.2d at 889 n.4 (citing 44 Fed. Reg. 67,586 (Nov. 26, 1979)).

[20] BIA Guideline B.1 states: "This guideline makes clear that the best source of information on whether or not a particular child is Indian is the tribe itself. It is the tribe's prerogative to determine membership criteria and decide who meets those criteria." 44 Fed. Reg. 67,586 (Nov. 26, 1979); *see also In re Application of Angus,* 60 Or. App. 546, 552, 655 P.2d 208 (1982) (an Indian tribe has authority to determine its own membership).

[21] *Kahlen W.,* 233 Cal. App. 3d at 1421.

[22] 52 Wn. App. 37, 757 P.2d 534 (1988).

[23] *Id.* at 41.

[24] 233 Cal. App. 3d 1414, 285 Cal. Rptr. 507 (1991).

mother's claim to Indian status, but could not identify the specific tribe in which the mother claimed to be a member. The court held that these efforts did not comply with ICWA because the agency's telephone calls to the tribes and BIA did not constitute proper notice of the child welfare proceedings. The court also held the mother's failure to cooperate was irrelevant, noting that the Act protects the rights of the tribe and Indian children, independent of the parents' rights and irrespective of their actions or inactions.[25]

■ ¶16 Here, no formal notice was given to the tribe or the BIA, even after the court ordered DSHS to investigate the children's Indian heritage. The court excused this failure on grounds Dunlavy failed to assist DSHS.[26] But once the court has "reason to believe a child involved in a child custody proceeding is an Indian child,"[27] both ICWA and RCW 13.34.070(10) place the burden of ensuring notice squarely on the shoulders of the court. Dunlavy's assertion of Cherokee heritage gave the court "reason to know," and triggered the notice requirements of 25 U.S.C. § 1912(a) and RCW 13.34.070(10). The court erred in failing to ensure notice of the termination proceedings was given to the tribe or the BIA.

¶17 Violation of the notice requirements of ICWA may be grounds for collateral attack on child custody determina-

---

[25] *Id.* at 1425. A minimum level of information must be available before the duty to notify arises. In *In re Adoption of Crews*, 118 Wn.2d. 561, 573, 825 P.2d 305 (1992), the Washington Supreme Court held that the notice requirements of ICWA were not triggered where the parents claimed Indian heritage but failed to suggest any relationship with an identifiable tribe.

[26] We do not discount the efforts made by DSHS to investigate Dunlavy's biological parents, or the need for Dunlavy to cooperate in the unsealing of her adoption records. Nevertheless, the statute anticipates circumstances in which the tribe cannot be readily identified, by requiring that notice be given to the BIA. Under the statutory scheme, the burden of identifying and providing notice to the proper tribe then shifts from the state court to the secretary of the BIA, who presumably has more resources and skill with which to ferret out the necessary information. *Kahlen W.,* 233 Cal. App. 3d at 1422. Further, although Dunlavy's delay in advising counsel of her heritage is deeply frustrating, notice is mandatory, regardless of how late in the proceedings a child's possible Indian heritage is uncovered. *See Junious M.,* 144 Cal. App. 3d at 791 (Indian heritage raised five years after dependency established).

[27] Guideline B.1, 44 Fed. Reg. 67,586 (Nov. 26, 1979).

tions.[28] The right of a child to basic nurturing, however, includes not only the right to a safe, stable and permanent home, but the right to a "speedy resolution of any proceeding."[29] Where notice is the sole issue, remand for the giving of proper notice is therefore ordinarily the correct course. This allows the trial court to affirm its original order if the tribe, once notified, determines the child is not Indian.[30]

¶18 Here, however, we reverse the termination order.

### Termination of Parental Rights

¶19 *History.* DSHS removed the children because of three concerns: C.G. was exhibiting significant growth problems, T.G. was exhibiting signs of emotional delay, apparently due to the parents' focus on C.G.'s needs, and the family was facing eviction. T.G. was then 27 months old, and C.G. was 14 months old. The initial shelter care order entered in August 2001 provided for supervised visitation once a week at DSHS offices in Everett, and required the parents to obtain psychological evaluations and to undertake training in caring for C.G.'s medical needs. In November, Dunlavy and Gilfillen moved to an appropriate home on Whidbey Island, where rooms were made ready for the children's return.

¶20 In January 2002, Dunlavy and Gilfillen signed an agreed dependency order, acknowledging the children's special needs and their own needs to address problems with

---

[28] 25 U.S.C. § 1914. The statute provides in part:

Any Indian child who is the subject of . . . termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.

[29] RCW 13.34.020.

[30] *See Colnar,* 52 Wn. App. at 41 (remanded to the trial court to notify the tribe, and, when the tribe did not intervene in the proceeding, original order affirmed). *See also In re M.C.P.,* 153 Vt. 275, 571 A.2d 627, 635 (1989) (remand to the trial court for notice: "If the tribe does not seek to intervene, or after intervention the trial court still concludes that the ICWA does not apply, the original orders will stand.").

anxiety and depression. Later that month, both parents became angry when C.G. did not attend a scheduled visitation in Everett, and a physical altercation occurred between Gilfillen and a security guard in the presence of T.G. As a result of this incident and earlier encounters, the visitation supervisor refused to continue, and all visitation ceased.

¶21 In April 2002, the court entered a disposition order requiring parenting classes[31] and psychological evaluations for both parents. The evaluations were to be performed by an evaluator acceptable to all parties, and were to include a parenting component and address whether anger management treatment was needed.[32] The court suspended visitation pending the outcome of the evaluations and eliminated the requirement that the parents undertake training in handling C.G.'s medical needs, apparently because C.G. no longer needed specialized feeding. DSHS was ordered to make all necessary referrals within two weeks, and to seek funding for all court ordered services.

¶22 *Evaluations.* On April 30, 2002, DSHS provided a list of approved psychological evaluators, and recommended Dr. Olson because he would be available quickly. By agreement of all counsel, however, Dr. Wheeler was selected, even though he was not available for at least four months. Dunlavy and Gilfillen appeared for their initial appointment with Dr. Wheeler on October 9, 2002. But Gilfillen questioned the wording of certain release and financial responsibility forms, and apparently became belligerent. Dr. Wheeler unilaterally refused to proceed.

---

[31] Both parents completed parenting classes at Catholic Community Services.

[32] The dispositional order provided:

The mother and father shall complete a DSHS and [guardian ad litem] and defense approved psychological evaluation with a parenting component and follow all recommendations. The evaluator shall be as mutually agreed by the parents, DSHS, and the [guardian ad litem]. DSHS shall make a referral within two weeks of the date the evaluator is agreed upon. The evaluation of the father shall also address medication issues. The psychological evaluations shall address the issue whether an anger management evaluation and/or treatment is recommended.

Ex. 12 at 2.

¶23 In December, Dunlavy and Gilfillen hired a social worker in private practice to assist them in reunification efforts.

¶24 Eventually DSHS arranged for another evaluator, Dr. Rawlings. Both parents attended the first meeting on March 18, 2003. Gilfillen's attorney cancelled the second appointment on March 28 because the parents had transportation problems from Whidbey Island. Dunlavy and Gilfillen in fact turned up for the appointment, but Dr. Rawlings had scheduled other work. He decided not to proceed with the evaluations because of future scheduling uncertainty.

¶25 In April, DSHS suggested alternate evaluators. The record does not disclose what resulted from those suggestions. That same month, Dunlavy and Gilfillen lodged a complaint with the department ombudsman that appropriate services had not been offered.[33] In June, Dunlavy and Gilfillen asked the court to authorize a counselor on Whidbey Island to complete their evaluations. DSHS objected that the proposed counselor was not a Ph.D. psychologist, as required by the dependency order. The court denied the motion.

¶26 In July, the court struck the requirement that the evaluations contain a parenting component, but added language requiring the evaluator to "determine whether a parenting component is needed."[34]

¶27 On July 3, 2003, the State filed petitions to terminate Dunlavy and Gilfillen's parental rights to both children, alleging that the parents' mental health issues rendered them "incapable of providing proper care for the children for extended periods of time,"[35] and that there was little likelihood conditions would be remedied because nei-

---

[33] The record does not reveal any response to the complaint by DSHS, and Nelson testified that no additional services were offered.

[34] Ex. 17 at 5.

[35] Clerk's Papers at 75.

ther parent had followed through with a psychological evaluation.

¶28 On July 16, the attorneys agreed to Dr. Olson as the psychological evaluator. Apart from moving the first appointment to the following week, Dunlavy and Gilfillen attended all scheduled appointments, although they were late in returning certain paperwork to Dr. Olson.

¶29 On November 13, 2003, Dr. Olson completed the evaluations. On November 24, the DSHS caseworker wrote to Dunlavy and Gilfillen, outlining the services recommended by Dr. Olson, which included anger management classes for both parents. Gilfillen immediately took steps to enroll.

¶30 Trial began December 3. A motion to continue to allow the parents to comply with Dr. Olson's recommendations was denied.[36]

¶31 Dr. Olson testified that Gilfillen had a series of mental health problems, including possible bipolar disorder and a personality disorder, and that Dunlavy had possible depression, possible paranoid delusional disorder, an unspecified personality disorder, as well as a learning disability (although he was unable to make definitive diagnoses for her because of lack of collateral information and because of Dunlavy's defensiveness during the clinical interview). He recommended medication, random urinalysis, and anger management classes for both parents, as well as a psychiatric examination for Dunlavy. He believed both parents needed three to five years of intensive psychotherapy. Dr. Olson did not undertake a parenting evaluation of either parent, did not review any collateral information regarding parenting skills (such as visitation reports), and did not testify as to any impact of their mental health diagnoses on their parenting skills.

¶32 The trial court terminated the parental rights of both parents. The court found that the long delay in obtaining the psychological evaluation was the result of

[36] No party assigns error to this ruling.

their manipulation; that they suffer from significant mental health issues that would require at least three years of specialized treatment, with a poor prognosis for treatment; that their mental illness rendered them incapable of providing proper care for the children for extended periods of time; and that any additional delay would be too long. Both parents appeal.

¶33 *Termination Standard.* An order terminating parental rights may be entered when the six statutory elements set forth in RCW 13.34.180[37] are established by clear, cogent and convincing evidence, and the court finds that termination is in the best interests of the child.[38] Clear, cogent and convincing evidence exists when the ultimate fact in issue is shown to be "highly probable."[39] The findings of the trial court will be affirmed if they are supported by substantial evidence.[40] While the best inter-

---

[37] The statute provides:

(1) A petition seeking termination of a parent and child relationship may be filed in juvenile court by any party to the dependency proceedings concerning that child. Such petition shall conform to the requirements of RCW 13.34.040, shall be served upon the parties as provided in RCW 13.34.040(8), and shall allege all of the following unless subsection (2) or (3) of this section applies:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

[38] RCW 13.34.190.

[39] *In re Dependency of H.W.,* 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998).

[40] *In re Matter of H.J.P.,* 114 Wn.2d 522, 532, 789 P.2d 96 (1990).

ests of the child are always paramount, we are also mindful of the fact that "[i]t is no slight thing to deprive a parent of the care, custody, and society of a child, or a child of the protection, guidance, and affection of the parent."[41]

¶34 Dunlavy and Gilfillen contend that two of the six termination criteria were not established by clear, cogent, and convincing evidence. They also contend termination was not in the children's best interests.

 ¶35 *Adequacy of Services.*[42] DSHS must expressly and understandably offer or provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."[43] This encompasses "all reasonable services that are available within the agency, or within the community, or those services which the department has existing contracts to purchase"[44] in order to enable a parent "to resume custody."[45] Dunlavy and Gilfillen contend DSHS did not offer them all reasonably available services capable of correcting their parental deficiencies.

¶36 A threshold problem here is that DSHS never identified the parental deficiencies to be corrected. The dependency petition stated the issues as physical neglect of C.G. and his failure to thrive, T.G.'s developmental delays due to parental focus on C.G., and a pending eviction. The allegations of neglect and C.G.'s failure to thrive related to inadequate nourishment while he had a gastrostomy, which he disliked; Dunlavy was allegedly inconsistent in ensuring he took in adequate nourishment through the tube. But the

---

[41] *State v. Rasch*, 24 Wash. 332, 335, 64 P. 531 (1901).

[42] The State argues this issue is not properly before us because Gilfillen failed to assign error to findings of fact 1.34 and 1.60 regarding the adequate provision of services. *See* RAP 10.3(a)(3), 18.13. However, Dunlavy does assign error to those findings, and Gilfillen assigns error to 1.54, which also expresses the same findings regarding provision of services. This is adequate. *See Sherrell v. Selfors*, 73 Wn. App. 596, 598-99, 871 P.2d 168 (1994).

[43] RCW 13.34.180(1)(d).

[44] RCW 13.34.136(1)(b)(iv).

[45] RCW 13.34.136(1)(b)(i).

tube was removed shortly after the dependency petition was filed; no medical education for the parents was ever offered, and the requirement for medical training for the parents was later deleted from the dispositional order. Regarding T.G.'s developmental delays, DSHS considered these a direct result of the parents' focus on C.G. and his medical problems. According to the evidence, the parents' care of T.G. had been appropriate before C.G.'s birth.[46] Finally, the family's housing issues were resolved early in the dependency, when Gilfillen's mother provided them a safe home suitable for the children on Whidbey Island.

¶37 In the agreed dependency order, Dunlavy and Gilfillen agreed they needed to address problems with anxiety and depression, but it is not clear how this related to their ability to parent the children. Despite the fact that mental health was the issue, DSHS never specified what aspect of parenting was affected and offered only two services after the dependency was established: parenting classes and psychological evaluations.[47]

¶38 DSHS contends other services could not be identified until the evaluations were complete.[48] But Gilfillen had advised DSHS of his diagnosis of bipolar disorder, and had released his doctor's report; DSHS knew that Dunlavy had been treated for depression. The IFPS therapist had identified her primary concerns as relational discord between the parents and mental health issues; she considered men-

---

[46] The children's pediatrician and the family practitioner both testified that T.G. always appeared to be appropriately cared for prior to C.G.'s birth.

[47] Prior to the dependency, in fall of 2000, related services were provided by the IFPS therapist, who helped Dunlavy develop parenting strategies, assessed parenting skills, worked on effective communication strategies, and made numerous referrals. At the close of her services, she identified the five most important service areas for the family as emotion management, accessing community services, housing, child development training, and communication skills development.

[48] The trial court found that "the primary service in this case has been the need for a psychological evaluation to determine what other services could be offered or provided." Clerk's Papers at 23. Gilfillen challenges this finding, whereas both Dunlavy and the State describe this as undisputed.

tal health counseling "crucial."[49] She specifically mentioned couples counseling, individual counseling, and Alcoholics Anonymous support groups. Yet, after the dependency was established, mental health services were withheld pending the evaluations. Current psychological evaluations were undoubtedly important, but it is unclear why no mental health services could be provided pending the evaluations, especially given the protracted delay.

¶39 Further, Dunlavy and Gilfillen completed parenting classes in October 2002. The provider recommended a further interactive parenting class, in which parents and children in foster care are brought together in a supervised environment for visitation and parenting training. Such a class was available on Whidbey Island. DSHS declined to approve funding.

¶40 The caseworker testified he believed he was obligated only to provide court-ordered services, and had no duty to suggest other services to the court.[50] This is incorrect. It is DSHS, not the court, that is in contact with the parties. The court will be unaware of the need for or availability of services unless the need is brought to the court's attention. Presumably this is why the statute expressly requires both that all services *ordered* have been provided, *and* that all *necessary* services reasonably available have been provided.[51]

¶41 Finally, DSHS was acutely aware of Gilfillen's need for anger management counseling, because he became abusive to caseworkers more than once. Dunlavy also had been confrontational with caseworkers and visit supervisors. Neither, however, was referred for anger management evaluation or counseling.[52] Not surprisingly, Dr.

---

[49] Ex. 115 at 11.

[50] *See* RP (Dec. 3, 2003) at 114-15.

[51] RCW 13.34.180(1)(d).

[52] This appears to result from an agreement among counsel to leave the question of anger management treatment up to the psychological evaluator. *See*

Olson recommended anger management counseling for both. But by then, trial was about to start.

¶42 The chief rationale for the court's finding that all services were offered is that the primary service consisted of the evaluations, and the parents caused the long delay in obtaining the evaluations through their manipulation. But the record does not support this. The delay cannot be laid solely (or even mostly) at the feet of the parents. The shelter care order entered when the children were first removed in August 2001 required psychological evaluations, but DSHS did not provide a list of approved evaluators until April 30, 2002. Then the attorneys could not agree on an evaluator. The evaluator eventually selected (Dr. Wheeler) was unavailable for another four months. After Dr. Wheeler withdrew,[53] another five months passed before the appointment with Dr. Rawlings. The scheduling difficulty that led to Dr. Rawlings' withdrawal was not created by the parents. Then there was further delay before the appointment of Dr. Olson,[54] caused in part by the efforts of the parents to have a local evaluator appointed. Apart from rescheduling one appointment with Dr. Olson, Dunlavy and Gilfillen attended all scheduled appointments with evaluators.

¶43 The State argues that Gilfillen caused the delays by inappropriate behavior, and that Dunlavy excused or denied his behavior. While this may describe the situation with Dr. Wheeler, it does not explain the other delays in obtaining the evaluations.

Ex. 6 at 4 (shelter care order); Ex. 12 at 2 (dispositional order). Neither parent assigns error to the failure to offer anger management counseling.

[53] Gilfillen objected to certain release and financial responsibility forms. While Gilfillen's behavior was apparently aggressive, Dr. Wheeler testified that other clients have expressed similar concerns. Gilfillen offered to sign the papers without amendment, to "get this moving forwards," but he also said Dr. Wheeler would be "liable," so Dr. Wheeler refused to proceed. RP (Dec. 9, 2003) at 700; RP (Dec. 4, 2003) at 209.

[54] One of the problems for the parents throughout the dependency was transportation. Their income was limited due to Gilfillen's disability from an industrial injury. They lived in a home on Whidbey Island owned by Dunlavy's mother, and they owned no reliable transportation. Access to services in Snohomish County was difficult. DSHS provided bus tickets and ferry passes.

¶44 Essentially, the parents are described as hostile, difficult to work with, and resistant to services. This is consistent with the IFPS therapist's report recommending that they receive assistance communicating with those in authority. It is also consistent with their need for mental health services. But it is also clear that while these parents were suspicious of DSHS, they wanted to reunify with their children. Dunlavy and Gilfillen completed parenting classes, attended the evaluation appointments, and made independent efforts to obtain services. They called the caseworker and the court to complain about the delay in scheduling the evaluations, filed a complaint with the DSHS ombudsman, hired a private social worker to assist them reunify, and asked the court to authorize a counselor on Whidbey Island to complete the evaluations.

¶45 The State relies upon *In re Dependency of P.D.*,[55] *In re Dependency of Ramquist*,[56] and *In re Dependency of T.R.*,[57] arguing that the parents' failure to make use of the services that were offered excuses DSHS from offering other services that might have been helpful. First, this assumes the parents resisted or refused services, which the evidence does not show. Second, these cases present very different circumstances. In both *P.D.* and *Ramquist,* mental illness left the mothers unable to benefit from further services.[58] In *T.R.*, the mother had been provided with multiple services over a six year period, and the court concluded that the one additional service the mother was seeking, reunification counseling, would not have improved her ability to function as a parent.[59] In all three cases, the evidence of

---

[55] 58 Wn. App. 18, 792 P.2d 159 (1990).

[56] 52 Wn. App. 854, 765 P.2d 30 (1988).

[57] 108 Wn. App. 149, 29 P.3d 1275 (2001).

[58] *P.D.*, 58 Wn. App. at 26-27 (mother's schizophrenia left her unable to care for herself, let alone child; she was gravely disabled and several times involuntarily committed); *Ramquist,* 52 Wn. App. at 861 (mother with schizophrenia frequently incarcerated or committed; unanimous expert testimony that parental deficiencies were untreatable).

[59] *T.R.*, 108 Wn. App. at 163.

mental illness was accompanied by extensive evidence of the resulting parental deficiencies. By contrast, Dunlavy's and Gilfillen's parental deficiencies were not identified, no treatment services were offered, and there is no finding they would have been unable to benefit.

¶46 Parents before the court in dependency proceedings rarely come without significant difficulties. Certainly Dunlavy and Gilfillen were frustrating clients, and their mental illness issues contributed to their hostility and to their difficulties in coping with DSHS. Nonetheless, they are not to lose their parental rights unless all services reasonably necessary and capable of correcting their parental deficiencies have been offered to assist them. The primary purpose of a dependency is to allow courts to order remedial measures to preserve and mend family ties, and to alleviate the problems that prompted the State's initial intervention.[60]

¶47 Further, mental illness is not, in and of itself, proof that a parent is unfit or incapable. The court must examine the relationship between the mental condition and parenting ability. Termination must be based on current unfitness; children may not be removed from their homes merely because their parents are mentally ill.[61]

¶48 Here, given the protracted delay in obtaining the evaluations, and the false premise that all other services should await the examination results, DSHS failed to meet the requirements of RCW 13.34.180. The finding that all necessary services were offered is not supported by the record.

¶49 *Likelihood of Remedying Conditions in Near Future.* The next question is whether the evidence supports the court's finding under RCW 13.34.180(1)(e)[62] that "there

---

[60] *Krause v. Catholic Cmty. Servs.*, 47 Wn. App. 734, 744, 737 P.2d 280 (1987).

[61] *In re Welfare of H.S.*, 94 Wn. App. 511, 528, 973 P.2d 474 (1999).

[62] RCW 13.34.180(1)(e) states:

[T]here is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially

is little likelihood conditions will be remedied so that the child[ren] can be returned to the parent[s] within the near future."[63] A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement.[64]

¶50 Here, the court found that even if the psychological evaluation had occurred earlier, services would not have been available that were capable of correcting the parental deficiencies within the foreseeable future. The question is whether the record supports this finding.

¶51 Dr. Olson testified that the parents needed three to five years of intensive treatment, and judged the prognosis for both to be poor. He also testified that compliance with therapy, anger management counseling, and a period of stability should be required before a parenting evaluation took place, because of uncertainties in the psychological diagnoses. But Dr. Olson made no assessment of parenting deficiencies, and he did not connect the need for treatment to parenting ability. We disagree with the State that his testimony amounted to saying that three years of

---

improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided.

[63] The court found that there is little likelihood that conditions will be remedied so that the children can be returned to the parents in the near future (based on the opinion of Dr. Olson that the parents have significant mental health issues and a poor prognosis for treatment). Clerk's Papers at 24. Dunlavy assigns error to these findings, but does not present argument. Gilfillen fails to assign error to these findings, but does present argument, and does assign error to finding 1.56, in which the court found that even if the evaluation had been completed earlier, services would not have been available to correct parental deficiencies in the near future. Clerk's Papers at 23. The State has made no claim of prejudice regarding the parents' presentation of the issues, and presented argument in response to both parents. RAP 10.3(g) allows appellate review of a claimed error where it is "clearly disclosed" and RAP 1.2(a) provides that the rules will be liberally interpreted to promote justice. We conclude that Dunlavy and Gilfillen's presentation of the issue is sufficient to allow review.

[64] See T.R., 108 Wn. App. at 165-66.

treatment was needed before the parents could care for the children. Dr. Olson made no such statement.

¶52 This record is thus a stark contrast to other cases involving mental health issues. In addition to the cases discussed above, we note that in *H.S.*, where parental rights were terminated due to mental health issues, the court described the record as "replete" with testimony that the parents had not benefited from parenting services, were unlikely to improve, and recounted a litany of parenting issues.[65] Similarly, in *In re Welfare of A.J.R.*,[66] where both parents were developmentally disabled, 15 physicians, psychologists, detectives, social workers and service providers testified that reasonably available services could not correct the parents' deficiencies regarding the care of their infant child.

¶53 Here, there was no parenting evaluation, no testimony connected the parents' mental health issues to parental deficiencies, and no mental health services treatment was offered over the two years of the dependency. The record does not support the finding that no services would have been able to correct the deficiencies.

¶54 Even where a court questions whether all necessary services have been provided, the best interests of the child are paramount, and the court will consider whether family reunification can occur within the foreseeable future.[67] What constitutes the foreseeable future depends on the age of the child and the circumstances of the placement.[68]

---

[65] *In re Welfare of H.S.*, 94 Wn. App. 511, 528, 973 P.2d 474 (1999).

[66] 78 Wn. App. 222, 225-28, 896 P.2d 1298 (1995).

[67] *T.R.*, 108 Wn. App. at 164 (citing *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983)).

[68] *See id.* at 165-66 (one year not "foreseeable" or "near" future for six-year-old child, who had never lived with mother, and mother had been receiving services for six years); *P.D.*, 58 Wn. App. at 27 (six months not in the near future of 15-month-old child, when mother had been hospitalized with schizophrenia for the duration of the dependency and six months was the earliest possible date for release from a secure environment).

¶55 Again, there was no testimony as to when the unidentified parental deficiencies might be remedied, and Dunlavy and Gilfillen have shown willingness to address *their problems. As to reunification, the evidence was scant.* Dr. Olson offered no opinion. Dunlavy testified that she felt the family could be reunified within six months, after counseling to address the effects of the two-year separation. The parents' private practice social worker testified the parents could make demonstrable progress in six months.[69] The guardian ad litem testified that if the parents could make a complete turnaround in six months, reunification was in the best interests of the children. At the time of trial, T.G. was four and a half, and C.G. was three and a half. The children are not placed together, and are not in permanent homes.

¶56 On this record, DSHS has not established that family reunification cannot occur within the foreseeable future.

## CONCLUSION

¶57 The court erred in failing to satisfy the requirements of ICWA. Further, DSHS failed to establish by clear, cogent and convincing evidence first, that Dunlavy and Gilfillen were offered all reasonably available services necessary to correct parental deficiencies, and second, that there is little likelihood conditions will be remedied in the near future.

¶58 Reversed and remanded for further proceedings.

AGID and APPELWICK, JJ., concur.

---

[69] The trial court rejected this testimony.