# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FILED: April 18, 2016
2016 APR 18 AM 11: 14
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

In the Matter of the Dependency of

A.S. (DOB: 05/08/2011)

)
)
)
)
)
)
)
)
)

No. 73166-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: April 18, 2016

APPELWICK, J. — The mother appeals the trial court's order granting the State's petition to terminate her parental rights as to her son, A.S. She argues the State failed to present sufficient evidence to support the trial court's conclusions that she is currently unfit to parent, that any remaining parental deficiencies could not be remedied in the near future, and that the termination of her parental rights was in the best interests of A.S. We conclude that substantial evidence supports the trial court's findings of fact and that those findings support the order of termination. We affirm.

## FACTS

A.S. was born on May 8, 2011. His biological father is unknown. In May 2012, the mother moved in with her then-boyfriend in Lynnwood, Washington.[1]

In June and July 2012, A.S. received treatment at Seattle Children's Hospital for injuries to his head, ears, hands, and toes. A social work consultant for the hospital noted that the injuries raised concerns of child abuse and neglect. On August 1, 2012,

---

[1] The biological mother is Robbyn Rohn. She is married to Dominque Rohn who was her boyfriend at the time of the injury to A. S. and the dependency.

the mother's neighbors called the police to express concern for A.S.'s care. Lynnwood police officers performed a welfare check and discovered that A.S. had a swollen arm. The mother had noticed the injury the day before. She told an officer that she had decided not to take A.S. to the hospital because the stepfather was concerned that Child Protective Services would become involved. The officers transported A.S. and the mother to Seattle Children's Hospital. Upon examination, A.S. was diagnosed with a fractured elbow that required surgery. Doctors also discovered injuries on his extremities and bruises on his abdomen, back, and neck.

Law enforcement placed A.S. into protective custody due to the nature of his injuries and the mother's failure to seek medical attention. The mother entered an agreed order of dependency and disposition on October 5, 2012. The court ordered the mother to complete a psychological evaluation with a parenting and cognitive component and follow through with any treatment recommendation. She was also required to complete an age-appropriate parenting program with a provider approved by the State. At the first dependency review hearing on December 5, 2012, the court determined that the mother was partially compliant with the required services.

On February 14, 2013, the mother and stepfather married. They had a daughter, A.R., on May 6, 2013. A.R. is also a dependent child, but she is currently placed with the mother. As a condition of A.R.'s placement, the stepfather is not permitted to live in the home. The court also ordered that the stepfather complete a neuropsychological evaluation with a parenting component, a drug/alcohol evaluation, and random urinalysis twice per week. Based on the stepfather's neuropsychological evaluation, the parties agreed that he would address his anger management and domestic violence

2

issues with an individual counselor, complete a psychiatric evaluation, engage in services with a life coach, and participate in parenting coaching during supervised visits.

Although the mother was initially compliant with the dependency order as to A.S., her progress eventually declined. The mother's dependency order as to A.S. permitted supervised visitation two times per week for two hours each visit. The plan allowed for expanded visits upon the agreement of the parties. But, because the mother failed to maintain consistent visits, the plan never expanded to allow for more visitation. Similarly, the stepfather's compliance with services in the dependency of A.R. declined.

On June 27, 2014, the State filed a petition to terminate the mother's parental rights as to A.S. The State argued that "[t]hroughout the dependency the parents have demonstrated an unwillingness to participate in and/or successfully complete services offered to correct parental deficiencies." The State also noted that although the mother had complied with the requisite services and visited A.S., "[s]he has not taken any responsibility for the child's injuries and she is now married to the man who allegedly physically abused the child and he remains a danger to the child." By the time trial began, A.S. had been removed from the mother's care for two and a half years.

Dr. Rebecca Wiester of Seattle Children's Hospital testified that the context surrounding A.S.'s elbow fracture in addition to the pattern and location of his bruises were unusual. Dr. Wiester's report stated, "Based on the past concerns for multiple and unusual injuries, which seem in some ways developmentally inappropriate or unexplained, I have great concern that this fracture is abusive in nature and [I am] concerned that the other injuries may be as well."

3

The mother acknowledged that the stepfather was previously diagnosed as a sexually aggressive youth with a conduct disorder, ADHD (attention deficit/hyperactivity disorder), and major depressive disorder. The stepfather also has criminal convictions that include domestic violence, animal cruelty, and domestic violence harassment.

The trial court granted the State's petition to terminate the mother's parental rights. She appeals.

## DISCUSSION

The mother challenges the trial court's order of termination. She argues the State failed to present sufficient evidence to support the trial court's conclusions that she is currently unfit to parent, that any remaining parental deficiencies could not be remedied in the near future, and that the termination of her parental rights was in the best interests of A.S.

Parents have a fundamental liberty interest in the custody and care of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Nevertheless, the State has a right and responsibility to intervene to protect a child when "parental actions or decisions seriously conflict with the physical or mental health of the child." In re Welfare of Sumey, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). In order to terminate parental rights, the State must prove the six statutory elements under RCW 13.34.180(1):

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. . . .

. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. If the parent is incarcerated, the court shall consider whether a parent maintains a meaningful role in his or her child's life based on factors identified in RCW 13.34.145(5)(b); whether the department or supervising agency made reasonable efforts as defined in this chapter; and whether particular barriers existed as described in RCW 13.34.145(5)(b) including, but not limited to, delays or barriers experienced in keeping the agency apprised of his or her location and in accessing visitation or other meaningful contact with the child.

(Emphasis added.) The State must prove these elements by clear, cogent, and convincing evidence. In re Dependency of K.D.S., 176 Wn.2d 644, 652, 294 P.3d 695 (2013). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by evidence to be 'highly probable.'" In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). If the State proves each of the statutory elements under RCW 13.34.180(1), the trial court must then determine, by a preponderance of the evidence,

whether termination is in the best interest of the child. RCW 13.34.190(1)(b); In re Dependency of A.M., 106 Wn. App. 123, 130, 22 P.3d 828 (2001).

We give a trial court's decision to terminate parental rights great deference on appeal and will uphold its findings of fact if they are supported by substantial evidence. In re Dependency of K.S.C., 137 Wn.2d 918, 925, 976 P.2d 113 (1999). "[W]e are not entitled to weigh either the evidence or the credibility of witnesses even though we may disagree with the trial court in either regard." Sego, 82 Wn.2d at 739-40. Our duty is simply to determine whether the necessary quantum of proof exists to support the trial court's findings of fact and order of termination. Id. at 740.

Here, the mother concedes the State met its burden regarding RCW 13.34.180(1)(a), (b), (c), and (d). She argues the trial court erred when it concluded that she is currently unfit to parent, that her parental deficiencies could not be remedied in the near future, and that termination of her parental rights is in the best interests of the child. Specifically, the mother assigns error to several of the trial court's findings of fact, including: 2.12, 2.12.1, 2.12.2, 2.12.6, 2.12.7, 2.12.14, and 2.15.

I.   The Likelihood that Conditions Will Be Remedied in the Near Future

The mother challenges the trial court's finding that the State met its burden under RCW 13.34.180(1)(e) that there is little likelihood conditions would be remedied in the near future. She similarly challenges the trial court's finding of current parental unfitness. The focus of this inquiry is whether parental deficiencies have been corrected. K.R., 128 Wn.2d at 144. What constitutes the "near future" depends on the age of the child and the circumstances of the placement. In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005).

Here, substantial evidence supports the trial court's finding that there was little likelihood conditions would be remedied in the near future. Several witnesses testified to the mother's inability to meet A.S.'s needs. Social worker Melissa Hoogendoorn testified that the mother exhibited parental deficiencies that prevented a safe reunification. Hoogendoorn explained that although the mother made progress early on in the dependency, her progress declined to the point where she was no longer in compliance with required services:

> So [the mother] has made some progress from the beginning of the case to where we are now, and it did appear that when she was in therapy that she was consistent in her therapy and making some progress with [her therapist], but the fact that we are here now and she is not in compliance with her mental health treatment and making progress in that and is not engaged in domestic violence support services and still sees no outcome other than parenting and being a family with [the stepfather] who is not a safe person to be around children, that is really concerning.

The mother also received two violation reports from her probation officer for failing to enroll in the required mental health services counseling and failing to attend domestic violence services.

Hoogendoorn also expressed concern that the mother failed to maintain consistent visits with A.S.:

> I am concerned that she's not in compliance with her services and that she has not made progress in those services. I am most concerned about the fact that her visitation -- her court-ordered visitation remains two times per week for two hours each supervised, and there's been over the course of two and a half years or however long it's been, there's been -- there hasn't been a lot of progress in that area.
>
> There was some supervised overnight visits that were going on . . . but she's still at supervised visits, and at this point since -- really since June of 2014 her visitation with [A.S.] has been really inconsistent and there's gaps of three or more weeks where she has not seen him at all, and that is really concerning to me to have a parent who sees their child so infrequently and then the thought of returning that child home

immediately, that would be really, really hard on her child because her child barely sees her, let alone lives with her, so it is really concerning that she's not -- that she's not making more progress in her visitation of [A.S.].

The maternal grandmother also testified that the mother failed to maintain consistent visits with A.S. A.S. lived with his grandmother throughout the dependency. The grandmother testified that she regularly invites the mother to A.S.'s doctors' appointments, holiday celebrations, and weekly activities. Despite knowing when these different activities occur, the mother rarely attended. The grandmother stated that the mother never attended A.S.'s medical appointments or dental appointments. She also said that A.S. has a weekly fitness activity at The Little Gym and that the mother "might have come to one during the summer."

Several witnesses also expressed concern that the mother continued to insist on raising A.S. with the stepfather, who posed a legitimate safety threat to A.S. Dr. Tatyana Shepel, who performed a psychological evaluation of the stepfather, testified that the stepfather was unsafe around children. She said he was inattentive to safety issues, and she was "struck and surprised how dishonest he was."

Hoogendoorn testified that the stepfather failed to comply with services ordered to address his anger issues:

> I am very concerned about [the stepfather] and his ability to manage his anger and the fact that he is not in compliance with any of his services or making progress in any of his services, and that I am concerned about his ability to safely parent children and that that's a concern of mine if she's also planning on being a family with him that creates another barrier for her in regards to having [A.S.] returned to her.

She also testified that the stepfather failed to complete the domestic violence batterer's evaluation and treatment and drug and alcohol treatment. Hoogendoorn expressed concern at the stepfather's inability to control his anger:

> He has difficulty controlling his anger. You know, as we heard from Dr. Shepel, he's not -- he's not forthcoming about really any aspect of his life. And I guess the biggest part really is, is his anger, his ability to control that, and his need to be intimidating especially when he's not -- I feel like when he's not understanding something that is going on, his initial response, his instinctual response is to be angry and to be the loudest person in the room, and that concerns me that when he gets to that frustration point that that's where he goes. Because kids make mistakes and kids are frustrating by nature as you are parenting them, and so if his frustration tolerance in level is that low for other adults, it really concerns me about what his frustration tolerance level would be when it comes to raising kids and caring for them.

Hoogendoorn personally experienced the stepfather's anger issues. She said that he had tried to intimidate her in the past, that he yelled at her on at least one occasion, and that he had "gotten in [her] face because he was angry."

The grandmother testified that the stepfather had threatened bodily harm to both her and another family member. The grandmother said that she was "concerned with [the stepfather] being in the picture" due to his anger issues. She tried to dissuade the mother from marrying the stepfather at one point but was unsuccessful.

Nia Crawford, the social worker who was assigned to the mother's case before Hoogendoorn, specifically testified that she believed the stepfather could injure A.S. This is particularly concerning given the circumstances surrounding A.S.'s injuries. Dr. Rebecca Weister believed A.S.'s injuries were likely the result of abuse and the mother provided inconsistent explanations for their origin.

9

Further, the mother admitted that she decided not to take A.S. to the hospital because the stepfather convinced her not to in order to avoid State involvement. But, despite these concerns surrounding the stepfather's ability to safely parent, the mother continues to insist on raising A.S. with him. The mother did not believe the State's concerns were valid. Regarding the stepfather's parenting abilities, the mother testified, "I don't feel he needs to work on anything." She later testified that, for the most part, the stepfather was perfect. Hoogendoorn testified that this is a major obstacle to reunification: "[S]he remains committed to parenting and being part of the family with a man who is not safe to be around children."

The record also supports the trial court's finding that "[m]ore time will be detrimental to the child." When determining the likelihood that conditions will be remedied in the near future, what constitutes the "near future" depends on the age of the child and the circumstances of the placement. T.L.G., 126 Wn. App. at 204. At the time of the trial, A.S. was three years and nine months old, and he had been living separately from the mother for two and a half years—over half of his life. Hoogendoorn testified that the mother could not meet A.S.'s needs at the time of trial and that waiting another three or six months would be ineffective. The mother had attempted to remedy her parental deficiencies for two and a half years and failed to do so.

This is unlike In re Welfare of C.B., 134 Wn. App. 942, 143 P.3d 846 (2006), upon which the mother relies. In that case, the children had not been removed from the mother in C.B. for as long as A.S. has been removed from the mother here, and the mother in C.B. demonstrated consistent improvement, unlike the mother here. See id. at 954-56.

Under these circumstances, we conclude that substantial evidence supports the trial court's findings of fact. The record shows that the mother failed to progress in her required services, including mental health and domestic violence counseling. It also shows that the mother failed to maintain consistent visits with A.S., and that she had the opportunity to visit A.S. on a somewhat regular basis but failed to do so. Similarly, the stepfather has also failed to comply with required services.

Further, testimony from several witnesses supports the trial court's finding that the stepfather poses a threat to A.S.'s safety. Testimony also supports the finding that the mother, by failing to acknowledge this threat, was currently unfit to parent A.S. Finally, given the child's age and circumstances of his placement, the trial court reasonably determined that more time would be detrimental to A.S. Therefore, substantial evidence supports the trial court's finding that the State met its burden to prove by clear and convincing evidence that there was little likelihood "that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e).

II. Parental Unfitness

Substantial evidence supports the trial court's finding of current parental unfitness. A judgment terminating parental rights cannot stand absent a finding of current parental unfitness. In re Welfare of A.B., 168 Wn.2d 908, 927, 232 P.3d 1104 (2010). Parental unfitness is implicitly established if the State proves all the elements under RCW 13.34.180. In re Welfare of H.S., 94 Wn. App. 511, 523, 973 P.2d 474 (1999). We may imply the existence of such a finding only if the facts and circumstances clearly demonstrate that the finding was actually made by the trial court.

A.B., 168 Wn.2d at 927. Here, the trial court made both implicit and explicit findings of current parental unfitness. As discussed above, substantial evidence supports these findings. For example, Hoogendoorn testified that the mother's lack of progress in her required services and inconsistent visitation made her unfit to parent.

Nevertheless, highlighting portions of the record demonstrating she complied with required services, the mother argues the trial court erred. She cites testimony demonstrating she engaged with counseling services and that she visited A.S. over 150 times by the time of the trial. But, it is not enough to show evidence that is arguably contrary to the trial court's findings of fact. "[W]e are not entitled to weigh either the evidence or the credibility of witnesses." Sego, 82 Wn.2d at 739-40. We merely must decide whether there is substantial evidence in the record to support the trial court's findings of fact. Although the record shows that the mother was partially compliant, other testimony indicates her compliance and visitation consistency declined. As discussed above, substantial evidence supports the trial court's findings of fact.

III.    The Best Interests of A.S.

The mother contends the trial court erred when it concluded that terminating her parental rights was in A.S.'s best interests. If the State proves the elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, the court must also find that an order of termination is in "the best interests of the child." RCW 13.34.190(1)(b). The State need only prove this element by a preponderance of the evidence. A.M., 106 Wn. App. at 130. When a parent has failed to correct parental deficiencies after a lengthy dependency, a court is fully justified in finding termination is in the child's best interests. In re A.W., 53 Wn. App. 22, 33, 765 P.2d 307 (1988). The factors that establish what is

12

in a child's best interests depend on the facts and circumstances of each case, and the trial court is entitled to great deference because of its advantage in having heard the witnesses before it. In re the Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

Substantial evidence supports the trial court's conclusion that termination was in A.S.'s best interests. A.S. had been in an open dependency for two and a half years. Hoogendoorn testified this instability is detrimental and that A.S. needed permanency. She further stated that A.S. needed "to either be returned home to his parent now at this moment in time or he needs to be available for adoption so that he can have that permanent bond." But, returning A.S. to the mother was not a viable option because of her parental deficiencies. She had not made sufficient progress with visitation or other required services. She further insisted on co-parenting with an individual who posed a threat to A.S.'s safety. Under these circumstances, the trial court reasonably concluded that termination was in A.S.'s best interests.

IV. The Trial Court's Findings of Fact Regarding the Stepfather

Finally, the mother argues the trial court's findings regarding the stepfather, particularly finding of fact 2.12.1, are unsupported by substantial evidence and unfairly construed as parental deficiencies against the mother.

But, as discussed above, substantial evidence supports the trial court's findings regarding the stepfather. Several witnesses testified to his troubling history and behavior. Dr. Shepel and Hoogendoorn both believed the stepfather was a threat to A.S.'s safety. The mother's inability to recognize the stepfather's deficiencies was a relevant factor in determining her fitness as a parent.

13

We conclude that substantial evidence supports the trial court's findings of fact. Further, these findings support the trial court's conclusions of law and the order of termination. We affirm.

WE CONCUR: