IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In Re: | ) | No. 31785-4-III |
| | ) | |
| A.B. | ) | |
| | ) | UNPUBLISHED OPINION |

SIDDOWAY, C.J. — L.L. appeals the decision terminating her parental rights to her daughter, A.B. Central to the trial court's termination of L.L.'s parental rights were its findings that L.L. is unable to recognize concerns for the health, safety, and welfare of A.B., and that her parental deficiency is unlikely to be remedied in the near future, if ever. Because the Department of Social and Health Services failed to meet its burden of demonstrating at least two essential termination factors—that it had offered or provided all necessary services and that L.L.'s parental deficiencies were unlikely to be remedied in the near future—we reverse and remand for vacation of the order terminating L.L.'s parental rights.

## FACTS

A.B., now eight years old, is the daughter of L.L. L.L., a rape victim, does not know who L.L.'s father is. When A.B. was born, L.L. was living with her father in Maryland. Shortly thereafter, L.L. moved to her mother's home in Massachusetts for.

financial support and help in raising A.B. This was despite the fact that L.L.'s mother had unresolved substance abuse problems and mental health issues, and had always been manipulative and belittling to L.L. and her brother and sister. L.L. described living with her mother as "pure hell." Report of Proceedings (RP) at 238.

Trisha Bann, a resident of Lewiston, Idaho, and a lifelong friend of L.L.'s mother, recognized how detrimental it was to L.L.'s well-being for her to live with her mother and encouraged L.L. to move to Idaho. In August 2010, L.L. met a man from Clarkston, Washington, Nick, whom she married several months later. She and A.B., who was then four years old, moved to Clarkston in December 2010. Shortly after marrying Nick, L.L. became pregnant with a second daughter, N.

L.L. has been diagnosed with bipolar disorder. At the time of the May 2013 trial in this matter, she testified that she had been receiving Social Security disability benefits as a result of her bipolar disorder for six years. She is prescribed several medications for the disorder,[1] which she ceased taking after learning she was pregnant.

Washington State's Child Protective Services (CPS) became involved with L.L. and her children when N. was injured as an infant. Doctors contacted CPS when N. sustained a skull fracture and they found the injury inconsistent with L.L.'s explanation that she had tripped and dropped N. When CPS social workers went to L.L.'s and Nick's

---

[1] Her prescribed medications have included a mood stabilizer, an antidepressant, and an antianxiety medication.

2

home, it was filthy, and firearms and pornography were accessible to the children. The children were taken into State care in early November 2011. Personnel of the Department of Social and Health Services later learned that during the time L.L. and A.B. had lived with L.L.'s mother, child abuse and neglect referrals were made concerning the care of A.B. A.B. had been removed from L.L.'s care at least once before.

The department filed a dependency action as to A.B. a few days after the hospital's referral. By agreement, A.B. was found dependent in late January 2012. A dependency dispositional order was entered on that same date.[2] By the terms of the dependency, L.L. agreed to a court-ordered service plan that required her to participate in a psychological evaluation and parenting classes, demonstrate learned skills during visits with her children, join a women's support group at the YWCA, and engage in counseling with a therapist at St. Joseph's Regional Medical Center. In addition, L.L. was required to ensure that no unsafe incidents occurred while the children were at visits, develop personal and community supports to assist with a safe return home of the children, maintain regularly scheduled appointments with her psychiatrist to manage her medications, report any out-of-the-ordinary manic or depressive behavior to her treatment team, ensure that firearms in her home had trigger locks installed and store ammunition separately from and out of the children's reach, maintain the home in a safe and sanitary

---

[2] N. was also found dependent, but that dependency was later dismissed. N. is in the care of her father, Nick.

3

fashion, develop a home maintenance schedule and follow it, sign releases of information, and notify the department within five days of a change of address or phone number.

Unlike most parental right termination proceedings appealed to this court that present more than enough evidence of unabated chemical dependency, failure to comply with recommended programs and services, haphazard visitation, or indifference to the steps necessary to avoid termination of a parent's rights, this case presents no evidence of substance abuse by L.L., and presents undisputed evidence that she complied with recommended programs and services and has a strong bond and loving relationship with A.B. In this atypical case, the department's petition to terminate L.L.'s parental rights focused on a specific deficiency that the department attributed to L.L.'s dysfunctional upbringing and her bipolar disorder: while acknowledging that "Mother has complied with all ordered services," it alleged that she had proved "unable to maintain a safe environment for either of her children. She corrects safety concerns when they are pointed out to her but is unable to adequately [gauge] safety on her own." Clerk's Papers (CP) at 4.

A two-day trial on the department's petition was held in May 2013. By that time, L.L. and Nick had divorced, but L.L. was pregnant (which she learned after finalization of the divorce) with Nick's child. At the time of trial, L.L. was still pregnant and once again off her medications. She was also living temporarily with Ms. Bann and looking

4

for new housing, having been fired from a position as a live-in caretaker for an older gentleman.

The trial court found that the department had met its burden of proof and terminated L.L.'s parental rights. In its oral ruling, the court stated that even if a parent complies with services, "if it's not safe for the child to come back home, they're never going to get their child back. And that's what we have here." RP at 377. After the court entered its order, findings, and conclusions, L.L. appealed.

## ANALYSIS

To obtain an order terminating L.L.'s parental rights for parental unfitness, the State was required to prove six elements, set forth in RCW 13.34.180(1), by clear, cogent, and convincing evidence, and that termination is in the best interests of the child. RCW 13.34.190(1)(a), (b); *In re Welfare of A.B.*, 168 Wn.2d 908, 920, 232 P.3d 1104 (2010). L.L. contends that clear, cogent, and convincing evidence does not support the court's determinations that the department provided or offered her all necessary services, that there is little likelihood her deficiencies will be remedied in the near future, or that the continuation of the parent-child relationship diminishes A.B.'s prospects for early integration into a permanent and stable home. She also contends that the department failed to prove that she is currently unfit to be a parent and challenges the trial court's finding that the order terminating her parental rights is in A.B.'s best interests.

Our review is limited to determining whether substantial evidence supports the

trial court's findings of fact. *In re Welfare of C.B.*, 134 Wn. App. 942, 952-53, 143 P.3d 846 (2006). A finding of fact "must be upheld if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *In re Welfare of M.R.H.*, 145 Wn. App. 10, 24, 188 P.3d 510 (2008). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be highly probable. *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973). We do not reweigh the evidence or pass on credibility, and we accord great deference to the trial court's decision to terminate.

We first summarize the evidence of L.L.'s alleged inability to maintain a safe environment for A.B. We then address L.L.'s challenges to the court's findings of two statutory termination factors. Finding them unsupported and that the lack of support for one is a sufficient basis for reversing the termination order, we need not address her remaining challenges.

### I. History In Support of Parental Deficiencies

*Pre-November 2010 child protective services referrals (before L.L.'s and A.B.'s move to Clarkston).* The State presented evidence that while L.L. and A.B. were living in the eastern United States with L.L.'s mother, A.B.'s welfare was the subject of child protective service referrals in May 2006, November 2006, March 2007, May 2009, and September 2010 that were investigated by state agencies. At least one referral resulted in a temporary removal of A.B. from L.L.'s care. In that case (the November 2006 referral),

L.L. had been hospitalized following a suicide attempt, left A.B. with her mother, and her mother then left A.B. with a friend "who ha[d] serious safety concerns." CP at 3. L.L.'s testimony that all of the referrals involved her mother in some fashion tends to be confirmed by the recount of the referrals in the department's petition for termination, which characterize L.L.'s mother as "a serious risk due to . . . unresolved mental health and substance abuse issues," and as having "significant mental health and substance abuse issues." *Id.*

L.L. acknowledged that the last referral, when she and A.B. were living with her mother in a fifth-wheel trailer in Connecticut, included an allegation that their living quarters were unsanitary. The department's petition for termination indicated that the Connecticut referral was not accepted for investigation, having been found "[u]nsubstantiated." *Id.* (emphasis omitted).

There was testimony from Sheila McDougall, the assigned caseworker, that the 2009 referral in Massachusetts (made when 3-year-old A.B. was found wandering on a busy street after being left with her grandmother) resulted in a second temporary removal of A.B. from L.L.'s care.[3] L.L. testified that the referral did not result in A.B.'s removal from her care. The department's petition for termination had recounted facts about the 2009 referral but, unlike its recount of the circumstances of the November 2006 referral,

---

[3] This testimony was given after the trial court overruled L.L.'s hearsay objection.

7

it did not suggest that the later referral resulted in removal of A.B. from L.L.'s care.

*November 2011: Unsanitary conditions following hospital referral.* Ms. McDougall, who had been assigned to A.B.'s case since its inception, testified that A.B. was removed from L.L.'s home in November 2011 because of the hospital's reported concern about A.B.'s younger sister N.'s skull fracture and because, when department social workers visited the home, it "was filthy, ah, dog feces and urine all over the floor, ah, clothing all over the place, and, ah, just a general mess—pornography accessible to the children." RP at 160-61. There was also "several unsecured firearms loaded in . . . the home—one right behind the front door." RP at 161.

*November 2011 to late June 2012 time frame.* Dates were not provided for most events occurring during the dependency that were described at trial. This is especially true for the first eight months after the department commenced the proceeding; the department did not call any visitation supervisors for that period to testify. The best we can do in most cases is place events from this period in the eight-month time frame.

There was generalized testimony about safety and care issues that were addressed during this time frame. L.L. testified that firearms in the home had been a point of contention between her and Nick even before the CPS referral, and that the day after N. was seen at the hospital, Nick removed them from the home. She testified that the pornography found in the home was material she purchased for Nick for the six-week period following N.'s birth during which her doctor recommended that L.L. not engage in

intercourse. Pornography was not identified as a concern anywhere in the trial record apart from its having been found in the home in November 2011.

L.L. submitted to a psychological evaluation by Dr. Richard Gallaher in three interviews conducted between December 8, 2011 and January 10, 2012. Although Dr. Gallaher did not test or independently diagnose her, he accepted her self-reported diagnosis of bipolar disorder, which he later testified was consistent with the medications she had been prescribed.

L.L. took the parenting class that she was asked to take by the department sometime during this time period.[4] The department had concerns about exposed wiring in the home and a bookcase that was not secured to the wall, and those concerns were addressed and corrected during this time frame.

*Observations from supervised visitation supervisor Kathy Suesz, late June 2012 to late August 2012.* The observations of Kathy Suesz, who supervised L.L.'s visits with A.B. for two months in the summer of 2012 can be tied to the late June 2012 to late August 2012 time frame. Visitation was twice a week, two hours a visit. Ms. Suesz was initially supervising joint visits with A.B. and N. by L.L. and Nick, but L.L. and Nick separated in mid-July and after that, Ms. Suesz supervised separate visits between the children and each parent.

---

[4] At a later date—the timing is not clear—L.L. testified that she took a second parenting class on her own.

9

Ms. Suesz testified that by the time she began supervising visitation, L.L. and Nick had already put up child gates and had closed doors so that the girls did not enter unsafe spaces. Ms. Suesz testified that she made unspecified additional suggestions about childproofing their home; the implication of her testimony was that her childproofing suggestions were followed.

Ms. Suesz testified to several general concerns, as well as specific instances where she felt the children were unsafe. Generally, she felt there was unhealthy competition between L.L. and Nick when they were living together and that L.L. had difficulty paying attention to both girls at one time. She had some concerns that L.L. wanted to be more of a friend than a mother to her children.

More specifically, Ms. Suesz identified two instances in which she had been concerned for the children's safety. The first was when L.L. and Nick allowed A.B. to climb on the back of the couch, stand on it, and write on a picture window, which L.L.— who was kneeling on a cushion at the other end of the couch—was writing on as well. On that occasion, Ms. Suesz expressed her concern to both parents, who did not act on it. On the second occasion, L.L. was tossing N. in the air and catching her; Ms. Suesz said she was uncomfortable with it and that it needed to stop. On that occasion, L.L. did stop, and Ms. Suesz never observed her tossing N. in the air again.

*Observations from supervised visitation supervisor Mercedes Walser, late August 2012 to time of trial.* Mercedes Walser assumed the responsibility for supervising L.L.'s

10

visitation with A.B. at the end of the summer in 2012. At the time, L.L., who had by then separated from Nick, was temporarily living with a friend in Lewiston. For the couple of months it took for L.L. to find an apartment, her visitation with A.B. and N. took place in a park. After L.L. got an apartment, visitation continued there. Evidently in or about April 2013, L.L. took a live-in caretaking job, from which she was fired; after that, she moved in with Ms. Bann while looking for shared or low-income housing.[5] As of the time of trial, L.L. was living with Ms. Bann and visitation was again taking place in a park.

At the time Ms. Walser began supervising visitation in L.L.'s apartment, she described L.L. as having "every single . . . gadget that you could have" for childproofing a home for children. RP at 61. She said there was a heater in the home that could get too hot, but that L.L. had warned the girls about it and, otherwise, "she had everything pretty well put away." RP at 62.

She testified that a problem developed at the apartment when L.L. got a pet dachshund that was not housebroken and whose "accidents" were tolerated by L.L. more, and for longer, than they should have been. RP at 291. Ms. Walser testified that the

---

[5] It was mentioned at the May 21 and 23 trial that L.L. had lived in the apartment until "fairly recently." RP at 90. Ms. McDougall testified that she had visited the home where L.L. was living as a caretaker on April 29, approximately three weeks before the trial, but that it had not been approved for visitation because Ms. McDougall had not received a completed background check on the owner. L.L. later testified to having been fired from the caretaking position and that she had moved in with Ms. Bann.

smell of dog feces and urine became overpowering and, when visiting the apartment, she would see dog feces behind the furniture and in the bathroom. At some point during visitation taking place during the several-week period of the dog problem, N. walked into the back of the apartment and returned with a piece of dog feces in her hand that she was getting ready to put in her mouth, causing L.L., according to Ms. Walser, to "leap[] across the floor," say "'No,'" grab it, and wash N.'s hands. RP at 78.

Ms. Walser reported the problems with the unhousebroken dog to Ms. McDougall, and was told that if this continued, Ms. Walser would have to cancel A.B.'s visits. Ms. Walser reported this back to L.L. She testified, "I informed [L.L.] about this and by the next week she had remedied that by, ah, shampooing the carpets and thereafter." RP at 62. According to L.L., in addition to regularly shampooing the carpets thereafter, she "trained [the dog] to be outside." RP at 291.

Ms. Walser testified that initially there were problems with L.L.'s tardiness to visitation. But over the course of her supervision L.L. made "substantial" improvements in that regard. RP at 73. There had also been a problem with the dog nipping at Ms. Walser and the children. L.L.'s ability to control the dog improved, according to Ms. Walser, and by her fourth visit the dog had stopped nipping and completely ignored the supervisor and the children.

Ms. Walser and others in the department were concerned about the snacks provided by L.L. during visits, given the importance of good eating habits, testifying

"there was a lot of sugar in the snacks initially." RP at 188. Reportedly, A.B.'s foster family "eat[s] very healthy," which Ms. Walser spoke to L.L. about, after which L.L. started providing A.B. with more nutritious drinks and snacks. RP at 67.

Ms. Walser expressed concern that L.L. was sometimes *over*protective of N. Ms. Walser testified that L.L. gradually improved in her ability to allow N. more freedom and accommodate the girl's inquisitiveness. When she began supervising visits, Ms. Walser testified that L.L. seemed preoccupied with other things and managing both girls was difficult, but L.L. had come to be able to focus on the children at the same time with all three playing together. Ms. Walser testified that L.L. had learned discipline methods in parenting classes and that she put them to use with her daughters.

Ms. Walser testified that on visits to the park, she never saw anything that caused her to be concerned about an immediate threat to the safety of either child. After the dog problem was cleared up, Ms. Walser could not identify any other concerns that were safety issues.

When it came to her opinion whether L.L. was ready for A.B. to return to L.L.'s care, however, Ms. Walser testified that she would not be comfortable moving to unsupervised visitation between L.L. and A.B. She felt uncomfortable because she did not view L.L. as settled. She stated,

> I think that [L.L.] would be more successful with someone who could teach her skills that—good nutrition, ah, more parenting skills on what's okay to watch or do or play, ah, communication skills, bedtime regiment [sic],

13

bathing, outdoor activities. . . . I think that she would benefit more with someone teaching those skills to her and—and her understanding what is being taught.

RP at 90.

Caseworker McDougall testified that she did not personally observe much visitation but that she did attend a visitation being supervised by Ms. Walser once, at L.L.'s apartment. By the time she visited the apartment with Ms. Walser, she testified that the sanitation problem with the dog "was solved." RP at 171. She testified that the dachshund bit her twice, however, breaking the skin once on her hip.

Ms. McDougall also testified that toward the end of the case, when she told L.L. that the department was moving toward termination and that her best chance of having continued contact was to have A.B. placed with a relative, L.L. initially provided only the name of her mother, calling a few days later to put forth her father's name. The department ultimately argued to the trial court that "nowhere is [L.L.'s] lack of judgment and insight more apparent" than it was in putting forth her mother as a placement option. RP at 359. When asked about it, L.L. agreed that her suggestion of her mother was, "what do you call it—stupidity. Ah, just one of those weird things like [']what was I thinking['] type of thing." RP at 307.

Ms. McDougall's conclusion from her and her colleagues' history with L.L. was that "if you point out a safety issue, [L.L.] is able to correct it if you tell her how to correct it, but she isn't able to recognize a safety issue before somebody points it out."

14

RP at 173. She expressed the view that L.L. would never be able to recognize and address safety issues on her own.

## II. Were Necessary Services Offered or Provided?

Under RCW 13.34.180(1)(d), the court must find that the department expressly and understandably offered or provided "all necessary services, reasonably available, capable of correcting the parenting deficiencies within the foreseeable future." "This encompasses 'all reasonable services that are available within the agency, or within the community, or those services which the department has existing contracts to purchase' in order to enable a parent 'to resume custody.'" *In re Dependency of T.L.G.*, 126 Wn. App. 181, 198, 108 P.3d 156 (2005) (footnote omitted) (quoting former RCW 13.34.136(1)(b)(i), (iv) (2000)). A service is necessary if it is needed to address a condition that precludes reunification of the parent and child. *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010).

The trial court entered three findings addressing whether the department offered or provided necessary services. The first addressed the unavailability of psychosocial rehabilitative services in Washington, and is not challenged by L.L. She challenges the trial court's second and third findings in support of the sufficiency of the department's efforts.

The trial court's second finding addressed L.L.'s argument during trial that a parenting assessment was a necessary and reasonably available service, but was not provided. She had elicited the following testimony from Dr. Gallaher:

Q. Can you tell me if there are any other sorts of evaluations, for example, a parenting assessment that you might do?

A. Ah, there—I could have done, should I be asked to do that, more of a parenting assessment. A parent—I did pieces of it. I asked her about her parenting knowledge and philosophy and how she managed and I asked her to describe the child. A more thorough parenting evaluation, ah, would have been to observe her with the child and to do a home visit. Ah, since [Department of Social and Health Services] as doing those things, they want me to focus on history and her as an adult since their records are all child oriented.

Q. Is this, ah, kind of evaluation something that you have done in the past?

A. Ah, the full or more complete parenting evaluation?

Q. That's—yes, (inaudible).

A. I have done some of those, yes.

RP at 32-33. Cross-examination of Ms. McDougall confirmed that no one had performed a parenting assessment of L.L.

After L.L. argued in closing that the department's failure to provide or offer a parenting assessment caused it to fail the statutory element requiring sufficient department efforts, the department's lawyer argued that

the one "service" that the respondent now is able to articulate that wasn't understandably, ah, and expressly offered or provided is a parenting assessment, and the reason for that is what Dr. Gallaher told you. He doesn't do them. He has on rare occasions. He doesn't do them. Ah, he's our contracted provider to do psychological evaluations, and in most cases, that's the best that we can get. Ah, it's—parenting assessment is not a service that's reasonably available. Your Honor has seen parenting

16

assessments. The—the local person that we get is Dr. Wilson. Dr. Wilson, sadly, is not a contracted provider with the Department. It's not a service that's reasonably available.

RP at 370. Consistent with this closing argument, the court's second finding that the department had satisfied its obligation to offer and provide services states:

A parenting assessment is not reasonably available because there is no contracted provider within 100 miles; however, Dr. Gallaher's psychological evaluation did incorporate some elements of a parenting assessment, so to the extent that service is reasonably available, it was provided.

CP at 39.

If it *is* a fact that "a parenting assessment is not reasonably available because there is no contracted provider within 100 miles," then that fact is not supported by the trial court record other than by the department's lawyer's closing argument. Argument is not evidence. Parenting assessment or evaluation is a service frequently mentioned as offered or provided in reported appeals of parental termination cases. We agree with L.L. that the trial court's finding that a parenting assessment was not reasonably available is not supported by clear, cogent, and convincing evidence.

It is not enough that the service might have been available, however; the department fails to demonstrate its compliance with RCW 13.34.180(1)(d) only if a service that it failed to provide or offer was "necessary" in the sense of being needed to address a condition that precludes reunification. Because the trial court dispensed with L.L.'s contention that no parenting assessment was provided on the basis that it was not

17

reasonably available, it did not reach the issue of whether a parenting assessment was necessary and capable of correcting L.L.'s parental deficiencies. Although this may be an issue in the event of a future motion to terminate, we need not remand for additional findings in light of our conclusion that the order terminating rights must be reversed on another basis, discussed in section III below.

L.L. also challenges the trial court's third finding in support of the sufficiency of the department's efforts, which states:

> All other services reasonably available and capable of correcting the parenting deficiencies, including but not limited to psychological evaluation, mental health counseling, medication management, parenting education, referrals to personal and community supports, individualized education on health and safety issues in the home, and case management, were expressly and understandably offered and provided.

CP at 39. She contends that she should have been provided with or offered the family preservation program, developmental disability services, and family reconciliation services. Because the record contains testimony from L.L.'s assigned social workers that L.L. either did not qualify for these services or that the program requested was not available in Washington State, this finding is sufficiently supported.

### III. Likelihood of Remedying Deficiencies in Near Future

The court must find that "there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). Three nonexclusive factors are identified as relevant to this element: the parent's

18

(i) chemical dependency, (ii) psychological incapacity or mental deficiency, or (iii) failure to have contact with the child for an extended period of time. RCW 13.34.180(1)(e)(i)-(iii). The department makes no allegation of a chemical dependency nor does it argue that L.L. failed to have contact with A.B.[6] The trial court entered findings of a psychological incapacity and a generalized finding that L.L.'s deficiencies were not remediable, both of which L.L. challenges as unsupported by the evidence. In considering these nonexclusive factors and other evidence bearing on whether conditions can be remedied so that the child can be returned to the parent in the near future, what constitutes "near future" depends on the child's age and placement circumstances. *C.B.*, 134 Wn. App. at 954.

RCW 13.34.180(1)(e)(ii) allows the trial court to consider psychological incapacity of the parent that "is so severe and chronic as to render the parent incapable of providing proper care for the child for extended periods of time or for periods of time that present a risk of imminent harm to the child," and where there is "documented

---

[6] The department elicited testimony from A.B.'s foster mother that there was a several-month period when she believed L.L. canceled many visitation opportunities, but Ms. Walser, who served as the visitation supervisor during that time frame, responded with testimony that there were several reasons for missed visits, including that A.B. or N. was ill; that L.L., who was then pregnant, had doctor's appointments; and that some visits were canceled due to Ms. Walser's own conflicts. Ms. Walser testified that she never got the impression that L.L. was disinterested in visiting A.B., and that L.L. asked for makeup visitation. But Ms. Walser admitted that her own schedule was "pretty slim," and "[u]nless I had a cancellation of another client, I wouldn't be able to fit it in." RP at 268.

19

unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future." Evidently relying on subsection (e)(ii), the trial court's first finding that there was little likelihood of remedying the parental deficiency in the near future stated that "[t]he mother's demonstrated history of bipolar disorder, for which she has been treated with medications and receiving disability payments for over six years, is clearly a chronic incapacity or deficiency within the meaning of RCW 13.34.180(1)(e)(ii)." CP at 39.

The evidence of the diagnosis of bipolar disorder is sufficient to prove a chronic incapacity or deficiency. And according to the department's petition, L.L. made a statement in November 2011 that when unmedicated and in a manic phase, she becomes dangerous for herself and her children. But that evidence is insufficient to support a finding that she has an incapacity or deficiency "within the meaning of RCW 13.34.180(1)(e)(ii)." "[M]ental illness is not, in and of itself, proof that a parent is unfit or incapable." *T.L.G.*, 126 Wn. App. at 203. "The court must examine the relationship between the mental condition and parenting ability." *Id.*

As L.L. argues on appeal, the trial court made no finding that her condition was severe, that she was unwilling to receive or complete treatment, or that the State documented that there is no treatment that can render her capable of providing proper care for A.B. in the near future—nor is there evidence in the record that would support

20

such findings. Dr. Gallaher testified that bipolar disorder, in and of itself, does not make one an unfit parent, and he testified that he was unable to make an evaluation of where in the spectrum of bipolar disorder L.L. would fall without seeing her off her medication.[7] What evidence was presented supported L.L.'s position that it was a reasonable decision to suspend her psychotropic medications while pregnant, for the safety of her unborn child. The medical records that she offered and were admitted into evidence demonstrated that she had suspended the medications with the knowledge and while under the ongoing care of a psychologist and physician. We reject the department's implicit suggestion that any woman with bipolar disorder who goes off her psychotropic medications during pregnancy is an unfit parent for the duration of the pregnancy.

L.L. also challenges the trial court's second finding in support of there being little likelihood of remediation in the near future, which states:

> Whether caused by bipolar disorder, poor parenting modeling, or developmental delays, the mother's demonstrated inability to recognize immediate or chronic concerns for the health, safety, and welfare of the child is unlikely to be remedied in the near future, if ever.

---

[7] When Dr. Gallaher saw L.L. in December 2011 and January 2012, she was still in her marriage and on her medications, both of which the doctor believed contributed to her stability. We are skeptical of the department's efforts to bootstrap those beliefs into a trial opinion from Dr. Gallaher, 16 months later (and without having seeing L.L. again) that, since L.L. had separated from Nick and suspended her medications during pregnancy, she likely presented a danger to her child.

CP at 39. She argues that insufficient evidence supports the finding that she has a "demonstrated inability to recognize immediate or chronic concerns for the health, safety, and welfare" of A.B. She also complains that the State failed to establish a time frame of what the "near" or "foreseeable" future was for A.B.

We agree that the record of the termination trial presently on review does not include sufficient evidence of a "demonstrated inability" on L.L.'s part to recognize danger to A.B.'s health, safety, or welfare. The record includes the testimony of department employees expressing the opinion that L.L. lacks the ability to recognize safety concerns. But when those employees were pressed by L.L.'s lawyer to identify the events that provide the basis for those opinions, the demonstration falls well short of the clear, cogent, and convincing standard of evidence to which the department is held. When Ms. McDougall was asked in cross-examination whether she could think of any behavior by L.L. that she had personally seen in the prior seven months that, but for supervision, would have caused immediate harm to one of the children, she could not; she deferred to the visitation supervisors who had personally observed L.L. with A.B. And the visitation supervisors' testimony revealed only the history identified above—not a particularly numerous list of events, and all of which had been addressed.

The record of this termination trial is, like the termination trial on review in *T.L.G.*, 126 Wn. App. at 205, in "stark contrast to other cases involving mental health issues" alleged to give rise to irremediable parental deficiencies. In the trial below, the

22

department did not even try to quantify what the "near future" meant for A.B.; instead, it resorted to a finding that the conditions would not be remedied in the near future "if ever." *T.L.G.* described the type of record it would expect to see where a parent who desires and has consistently worked toward reunification with a child is found to be incurably incapable:

> [I]n [*In re Welfare of*] *H.S.*, [94 Wn. App. 511, 528, 973 P.2d 474 (1999)] where parental rights were terminated due to mental health issues, the court described the record as "replete" with testimony that the parents had not benefited from parenting services, were unlikely to improve, and recounted a litany of parenting issues. Similarly, in *In re Welfare of A.J.R.*, [78 Wn. App. 222, 225-28, 896 P.2d 1298 (1995)] where both parents were developmentally disabled, 15 physicians, psychologists, detectives, social workers and service providers testified that reasonably available services could not correct the parents' deficiencies regarding the care of their infant child.
>
> Here, there was no parenting evaluation, no testimony connected the parents' mental health issues to parental deficiencies, and no mental health services treatment was offered over the two years of the dependency. The record does not support the finding that no services would have been able to correct the deficiencies.

126 Wn. App. at 205 (footnotes omitted); *cf. In re Welfare of A.B.*, 181 Wn. App. 45, 64-65, 323 P.3d 1062 (2014) (holding that while the concerns of department employees about a parent's cognitive impairment preventing her from identifying subtle dangers to her child sufficed for the purpose of establishing dependency, the parent's impairment did not make it highly probable that the child would be harmed, thereby rendering the parent unfit to parent for the purpose of permanently terminating her parental rights). "If an absolute guarantee of safety were required, we have a difficult time envisioning a case

in which the court could properly return a child to parental custody. Even the mythical perfect parent cannot *guarantee* anything." *David B. v. Superior Court*, 123 Cal. App. 4th 768, 797, 20 Cal. Rptr. 3d 336 (2004).

The examples of past safety issues proved in this case do not establish by clear, cogent, and convincing evidence that L.L. had "a demonstrated inability to recognize immediate or chronic concerns" that was unlikely to be remedied in the near future, if ever.

### *IV. Remaining Challenges*

Given our decision that the department failed to demonstrate two of the termination factors, we need not address L.L.'s additional challenge to a third termination factor (that continuation of the parent and child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home, as required by RCW 13.34.180(f).

It follows necessarily from the department's failure to demonstrate the statutory factors that it has failed to demonstrate L.L.'s current unfitness, which due process requires be proved before the State can terminate her relationship with A.B. *See In re Dependency of K.R.*, 128 Wn.2d 129, 141-42, 904 P.2d 1132 (1995) (holding that Washington's termination statute implicitly requires evidence of current parental unfitness, comporting with constitutional due process requirements).

No. 31785-4-III
*In re A.B.*

Because the department has not met its burden in the fact-finding phase of terminating L.L.'s rights, we need not reach the dispositional phase designed to separately address L.L.'s best interests. *See A.B.*, 168 Wn.2d at 926 (holding it premature to address the second phase before resolving the first).

We reverse and remand for vacation of the order terminating L.L.'s parental rights. We note that the dependency remains in effect and that the department may file another petition to terminate.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Brown, J.

Korsmo, J.

25